Decreed accordingly.

---

(89 Misc. Rep. 663)

## In re CUTTER'S WILL.

(Surrogate's Court, New York County. March, 1915.)

WILLS ⬥⇒55, 166—PROBATE—TESTAMENTARY CAPACITY—PROOF.

Where the uncontradicted evidence shows that testatrix, at the time of making a will offered for probate, was an aged, diseased, drug-eating woman, who, by infirmities and seclusion, was prevented from receiving disinterested advice, and that her use of drugs continued to within a day or two of her death, which was less than a month after execution of the will, the third will made by her within nine months, by which she disposed of an estate worth over $1,000,000, probate will be denied, on the ground that proponents have not sustained the burden resting on

them to clearly show that she had testamentary capacity and that the instrument expressed her free will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161, 421–437; Dec. Dig. ☞55, 166.]

Proceedings on the contested probate of the will of Amelia Gertrude Cutter, deceased. Probate denied.

See, also, 148 N. Y. Supp. 920.

Miller, King, Lane & Trafford, of New York City (Perry D. Trafford, of New York City, of counsel), for George Ramsey and W. McMaster Mills.

Woodford, Bovee & Butcher, of New York City (Gormly J. Sproull, of New York City, of counsel), for Euretta Flagg.

De Groot, Kenyon & Huber, of Brooklyn, for Elizabeth G. Buckley.

John McG. Goodale, of New York City, special guardian for John Walls.

A. Perry Osborn, of New York City, special guardian for unknown infants, etc.

Satterlee, Canfield & Stone, of New York City, for Mary Patten.

Merle I. St. John, of New York City, for John Lent, Elizabeth Buckley and George W. S. Lent.

The Attorney General, for unknown beneficiaries.

De Forest Bros., of New York City, for Presbyterian Hospital.

George S. Ingraham, of Brooklyn, for Methodist Episcopal Hospital.

O'Brien, Malevinsky & Driscoll, of New York City, for James H. Montgomery.

J. Mayhew Wainwright, of New York City, for American Society for Prevention of Cruelty to Animals.

Cornelius J. Sullivan, of New York City, for New York Society for Prevention of Cruelty to Children.

Richard B. Kelly, of New York City, for Methodist Episcopal Church Home.

Kendall & Herzog, of New York City, for Hospital for Deformities and Joint Diseases.

COHALAN, S. Henry T. Cutter, a large, if not the largest, stockholder in the drug house of Hegeman & Co., and his wife, Amelia G. or A. Gertrude Cutter, lived for about 38 years in a large old-fashioned corner house at No. 781 Lexington avenue in this city. The house was sumptuously furnished with (as one witness described it) "the best that money could buy." In this home Mrs. Cutter gave many entertainments. Her own and her husband's relatives were received there by her. They seemed to be interested in her and she in them. The Cutters had no children. Up to about the last ten years of her life Mrs. Cutter lived as women in her circumstances usually do. She had servants and entertained her friends "in style," as one witness expressed it. She dressed well, even extravagantly. She attended the opera and the theater. She had horses, employed a coachman, and went

driving regularly. She gave to her toilet and appearance the care and to the amenities of social intercourse the attention that is naturally expected from a woman of refinement. When Cutter was about 75 years old, his wife then being about 65 years of age, a change came over their habits and method of living. Mrs. Cutter abandoned largely her social interests and duties. She lost her interest in the niceties of. dress. She gave up her attendance at the opera, disposed of her horses, discontinued her entertainments, and discharged her servants. Eventually Cutter and she became practically recluses, almost unattended. In 1913 we find that they had reached a condition where they lived by themselves, using only two rooms and a pantry on the second floor of their house, at No. 781 Lexington avenue; their only attendant being a furnaceman named "Beamish." His attention to the old couple was irregular, owing to an unfortunate addiction to drink. Mrs. Cutter, at times assisted by "Beamish," prepared the meals for the household on a two-burner gas stove in a pantry or passageway between the living room and the sleeping room on the second floor of the house.

After a serious illness Cutter died January 20, 1914, about two months prior to the execution of the paper herein propounded. At the time of his death he was 83 or 84 years of age. He was helpless, feeble, and diseased. The upstairs rooms of the house were always in great disorder. Except for the basement, the other parts of the house were kept locked. During this period the aforementioned "Beamish" looked after matters generally and attended to the furnace and marketing (when he was not too drunk to do so). There was no other servant. "Beamish" called in the morning and obtained admission to the house by the use of a key which Mrs. Cutter let down on a string from a front window on the second floor of the house. Empty, unclean milk bottles, milk bottles in which the milk had soured, empty and partly filled cans, old vegetables, scraps of food which had not been eaten, used, unwashed dishes, soiled clothing, old rags, and unclean vessels were scattered about the rooms or put away in the closet. Mrs. Cutter was averse to taking a bath or to having her body touched with water. She wore the same dress and petticoat and the same nightgown for the last two weeks of her life; in fact, from January to March these articles of clothing seem to have been worn by her continuously, and were always soiled and dirty. She wore her hair hanging, uncombed, and unkempt. She ate raw oysters out of a pail with her fingers. When Cutter lay dying on the bed in January, 1914, Loretta McLaughlin, a seamstress, who remained in the house with Mrs. Cutter the last night of Cutter's illness and for a short time after his death, suggested to her that she moisten Cutter's lips. Mrs. Cutter declined to do so, and told Miss McLaughlin she could do so if she wished to, but that she (Mrs. Cutter) was going to fix up the parlor for the funeral, which she then proceeded to do. The night before Cutter died Miss McLaughlin stated to her that her husband was dying and suggested that she sleep that night on a couch in the living room. Mrs. Cutter refused to do this, and said she was going to sleep with "Bubby," whereupon she got into bed with the dying man and spent the night there.

The next day Cutter died. Mrs. Cutter stated to Miss McLaughlin that she was afraid he would haunt her, owing to the fact that she had kicked him the night before he died because he had threshed around in the bed and bothered her.

During Cutter's illness, and in spite of the fact that he was worth upwards of $1,500,000, Mrs. Cutter failed to call in a trained nurse or an attendant to wait on him. She had "Beamish" cut a hole through the mattress, upon which Cutter lay ill, and placed rags on the floor underneath the bed to receive the excrement from him. The day of Cutter's funeral Miss McLaughlin offered to assist Mrs. Cutter in dressing for the funeral. She refused to take off, or permit to be taken off, the soiled nightgown she was wearing, and put on her outer clothing over this nightgown. After Cutter's death Miss McLaughlin remained with Mrs. Cutter for a few days. When Miss McLaughlin left, "Beamish," the man of all work, used to dress and undress Mrs. Cutter and used to take her to the bathroom. After the making of the will of March 21st, Mrs. Jaeger, the wife of a neighborhood grocer, came in and looked after Mrs. Cutter as best she could until the death of testatrix on April 3, 1914. "Beamish" and Mrs. Jaeger were the only nurses Mrs. Cutter had in her last illness. During this period there were filth and ordure on the floor, on the chairs, and in the vessels which were left unclean in the upstairs rooms. Mrs. Cutter objected to having the windows open, and the rooms always had a foul odor, due to their unsanitary condition.

In one of these rooms she received visits from Ramsey, Mills, Tichenor, Bradner, Frauenthal, and other actual and potential beneficiaries. In one of these rooms the paper propounded for probate was signed. Testatrix suffered from cancer of the uterus, chronic nephritis, toxemic poisoning, due to obstruction of the bowels, general anemia, and arteriosclerosis. During this period she habitually took large quantities of morphine and codein. She used these drugs up to within a day or two of her death. There is no evidence that the doctors ever attempted to procure for her a trained nurse, nor did Ramsey, Mills, or Tichenor ever attempt to bring in a trained nurse to take charge of this dying and suffering old woman. In spite of the filthy condition of her bed and clothing, and though one of these doctors was a beneficiary, and must have been aware of her condition, she was not removed to a hospital, where she would be forcibly bathed, nor was any action taken in her behalf which common humanity would require. Was this because, as one of the witnesses said, Mrs. Cutter was "cranky" and would not submit to the ministrations of a trained nurse, or was it because the beneficiaries in the propounded paper desired no outside interference with the scheme that had been concocted by them to divide among themselves an estate which may amount to upwards of $1,500,000? Their sole ambition seems to have been to get the largest possible bequest from Mrs. Cutter, their sole endeavor to vie with each other in attempting to obtain the last will signed by this diseased, drug-eating, dying old woman.

On March 21, 1914, to the house above described came Ramsey and the attorney for proponents to have the propounded paper signed by

this woman. With them came the draftsman of the will, the witnesses—Olney, a clerk in said attorney's office; Lindermann, a clerk in the Union Trust Company, of which Mills was a vice president; Gibney, another clerk in the same bank; and Eckstein, an employé of a drug company in which Ramsey had an interest. Olney came at the direction of his employer, Lindermann and Gibney by direction of Mills, and Eckstein by telephonic direction of Ramsey. They were admitted by "Beamish" and brought downstairs to the basement. Tichenor, a beneficiary in the propounded paper, was at that time closeted with Mrs. Cutter. Ramsey told "Beamish" not to tell Tichenor that he (Ramsey) was in the house. When Tichenor left the house, Ramsey went upstairs. He returned in a few minutes and invited the draftsman and the proposed witnesses to the will to come with him to the living room of Mrs. Cutter. They found Mrs. Cutter propped up on a couch, wrapped in blankets. The attorney read the will to her. As the different clauses were read, she nodded or said "Yes." When the clause was read bequeathing the residuum of the estate to Ramsey and Mills, to divide among such charities as they saw fit, she remarked that she did not know about the charities, or words to that effect. She was told that most of the legacies were the same as those in her husband's will. She said her husband's will was a "jumbled-up mess," and that she did not understand her husband's will anyway. The draftsman of the will and attorney for proponents was evidently not aware of Ramsey's anxiety to get the last possible will from the testatrix, nor did he appreciate the rivalry between Frauenthal, Tichenor, and Ramsey as to which of them would procure the last favorable will from the decedent. It appears that he made no particular inquiry or observation as to whether or not the paper signed by Mrs. Cutter on March 21st was in reality the free, unrestrained act of a competent woman, who at least had an opportunity to receive independent advice. It can be fairly inferred from the testimony that he came to the house at the request of either Ramsey or Mills, not at the request of the testatrix.

Here in the living room on March 21, 1914, Mrs. Cutter signed the paper propounded for probate. It was also signed by the subscribing witnesses, and there is no doubt that what might be called the mechanics of executing a will were gone through with a proper regard for the forms of law. The propounded paper is the third will made by Mrs. Cutter during the last nine months of her life. In August, 1913, Tichenor supervised the execution of a will in which Mrs. Cutter bequeathed to him a legacy of $500,000. On March 11, 1914 (ten days prior to the execution of the will propounded for probate herein), Frauenthal's attorney, Mr. Kendall, prepared a will. In this will Tichenor's legacy was cut to $50,000, and the residuary estate (which may amount to $700,000) was left to an institution of which Frauenthal is the head. Tichenor was unaware of the execution of the will of March 11th, or the one offered for probate herein. In these two wills Ramsey and Mills are given legacies of $200,000 and $100,000, respectively.

In the will now being contested, which is dated March 21, 1914, and with the drawing and execution of which neither Frauenthal, nor his attorney, nor Tichenor was connected, a material change is made in the

disposition of the residuary estate.  In this last-mentioned will the re-residuary estate is bequeathed to Ramsey and Mills, in trust to give to such charities as they prefer.  Frauenthal's institution, the residuary legatee in the will of March 11th, receives a legacy of $25,000, instead of the residuary estate.

It is fairly evident, therefore, that during the last months of her life testatrix was apt to favor in her will whoever procured and supervised the execution thereof.  There is testimony showing that Ramsey was dissatisfied with the will of March 11, 1914, in which Frauenthal's institution was the chief beneficiary.  Ramsey said the will of March 11th was illegal and would not stand a test in a court of law.  He called on Kendall, the attorney who drew this will, and asked him to have Mrs. Cutter execute a codicil making a bequest to a charity in which Mrs. Ramsey was interested.  It appears that Ramsey had charge of the execution of the propounded paper.  Ramsey procured the four witnesses, Ramsey made arrangements for the witnesses to attend the house, Ramsey had charge of the party at the house, Ramsey gave instructions to "Beamish," and Ramsey brought the witnesses to Mrs. Cutter's room.

The testimony leaves no doubt that Mrs. Cutter's mind had become greatly weakened during the last few months of her life.  There can likewise be no doubt that during this period her mind was constantly drugged by the morphine and codein she was in the habit of taking.  During this period Ramsey, Mills, and Tichenor were frequent visitors at the house.  Tichenor bought chops for her at a neighborhood butcher store.  He sometimes attended to the furnace.  Ramsey, not to be outdone, brought chickens to her.  The two persons who appear to have been most kind to her, "Beamish" and Mrs. Jaeger, are not remembered in the will, although she had promised Mrs. Jaeger two houses and stated that she would remember "Beamish" in her will.

Various experts gave testimony for the proponents and for the contestants concerning the testamentary capacity of the deceased.  I shall only refer to the testimony of the proponents' experts.  Dr. Jeliffe, for the proponents, testified that the effect of taking drugs, such as acetanilid, codein, and morphine, would tend to make Mrs. Cutter inattentive and cause her to show less interest in what went on about her.  He said that this inattention and lack of interest might also extend to other things besides immediate surroundings.  Dr. Gregory, the proponents' other alienist, was of the opinion that the testatrix had testamentary capacity to make the will offered for probate, because it was not an entirely new will; "that she had made wills before, and that this will in a way was in harmony with her previous wills."  He said:

"Q. Then, if this had been a new proposition, a new question and a new will, could she have had intelligence enough to attend to it?  A. It would have been difficult for her, a sick person, to transact an entirely new business in that condition."

And further:

"If we assume that she made a will that day that was entirely different, and that she mentioned many individuals who were new to her, that had no

connection with the previous will, I should say that it would be very difficult for her to do that, because of her physical sickness."

The will offered for probate is not a simple will. .It contains the names of many legatees, with legacies of various amounts. There are several provisions that require considerable intelligence to grasp. The testimony of proponents' own alienist, Dr. Gregory, is to the effect that the testatrix was unable to comprehend the contents of the will as a new proposition. Proponents' witnesses testified that the deceased said, at the time of the execution of the will, that her husband's will, which the later wills followed in part, was a "jumbled-up mess." This would indicate that at the time of executing the paper propounded the testatrix was unable to understand the wills upon which the last will was based. There is a material change between the will of March 11, 1914, and the will of March 21, 1914. Dr. Frauenthal's hospital is cut down from a possible $700,000 to a legacy of $25,000, and the difference is handed over to Ramsey and Mills, to distribute to whatever charities they prefer. There is nothing to explain this change of testamentary intention, except a possible motive of cupidity on the part of Ramsey.

The above facts show this to be a case having all the ordinary indications of fraud. The uncontradicted facts show that the deceased had become greatly weakened in mind and body. She was of advanced age, and, because of her bodily and mental infirmities and her absolute seclusion, was practically prevented from receiving independent and unselfish advice. Her easy accessibility to the approach of designing men, together with the other remarkable features and circumstances of the case, cast upon the proponents a heavy burden to show clearly and satisfactorily that at the time of executing the paper propounded herein the testatrix had testamentary capacity and that such paper expresses the free and untrammeled will of a capable testatrix. Without any further discussion of the principles of law involved, I will say that I am not satisfied that the proponents have discharged that burden, and I will therefore deny probate to the paper propounded as the last will and testament of the deceased.

Probate denied.